# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEJUAN KIRKENDALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 4:13CV1057 CAS** |
| | ) | **(NCC)** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.[1]** | ) | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner to cease Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. § 1381 et seq., for Dejuan Kirkendall (Plaintiff). Plaintiff has filed a brief in support of the Complaint. (Doc. 17). Defendant has filed a brief in support of the Answer. (Doc. 22). Plaintiff has also filed a Reply. (Doc. 26). The cause was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to Title 28 U.S.C. § 636(b)(1). (Doc. 25).

## I.
## PROCEDURAL HISTORY

Plaintiff, who had been found eligible for SSI as a child, was receiving such benefits when he turned 18, on October 9, 2008. He was notified that he was found no longer disabled as of April 15, 2009, based on a redetermination of disability under the rules applicable to adults

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she should be substituted for Michael J. Astrue as the defendant. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Act.

who file new applications. (Tr. 22, 97, 101). Plaintiff appealed, and the cessation was affirmed on reconsideration. (Tr. 124). His request for a hearing before an Administrative Law Judge (ALJ) was dismissed based on his failure to appear at the scheduled hearing. (Tr. 90). The Appeals Council granted Plaintiff's request for review and remanded the matter to the ALJ. (Tr. 93). Following a hearing, by decision dated April 9, 2013, the ALJ found Plaintiff's disability had ended as of April 15, 2009, and that Plaintiff had not become disabled after that date. (Tr. 20-30). On March 28, 2013, the Appeals Council denied Plaintiff's request for review. (Tr. 4). As such, the ALJ's decision is the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484

F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>See</u> <u>id.</u>

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); <u>Eichelberger</u>, 390 F.3d at 590-91; <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. <u>See</u> <u>Steed</u>, 524 F.3d at 874 n.3; <u>Young</u>, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." <u>Id.</u> <u>See also</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); <u>Stormo v. Barnhart</u>, 377 F.3d 801,

806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of

evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence").  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently.  See Krogmeier, 294 F.3d at 1022.  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

<u>Brand v. Sec'y of Dep't of Health, Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980); <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." <u>Ford v. Astrue</u>, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

<u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d. 552, 555 (8th Cir. 1992); <u>Polaski</u>, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. <u>Id.</u> The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's

appearance and demeanor at the hearing.  See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence.

Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which he finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

## III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

As relevant, prior to the termination of Plaintiff's benefits, on March 9, 2009, Plaintiff presented for a psychological evaluation to Lenora V. Brown, Ph.D., pursuant to a referral from the Missouri Department of Social Services, Family Support Division. Two versions of Dr. Brown's report are included in the record. In her initial report, Dr. Brown reported that Plaintiff

had a score of 57 on the verbal portion of the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III); because Plaintiff "left his glasses at home and was having difficulty seeing," only the verbal portion of the test was administered and the "full administration of intelligence testing could not be completed"; based on the verbal portion of the WAISS test, "it [was] likely that [Plaintiff's] social and occupation functioning [were] significantly impaired"; and "further psychiatric evaluation [was] recommended." Dr. Brown diagnosed Plaintiff with "mild mental retardation." (Tr. 653-58).

In her "revised report," Dr. Brown stated that Plaintiff "seemed to have significant difficulty completing the Picture Completion [WAIS-III] subtest"; "when queried, [Plaintiff] reported that he had left his glasses at home and was having difficulty seeing"; "[a]t that point, the administration of this subtest was discontinued"; and because the discontinued portion of the WAIS-III assessed "visual abilities only the verbal subtests" were given. Dr. Brown noted that Plaintiff "appeared to be aware of and frustrated by the low level at which he performed," and she did not think Plaintiff had "attempt[ed] [to] perform less than his true capabilities." In this second report, Dr. Brown diagnosed Plaintiff with a GAF of 50, and stated that as a result of his failure to bring his glasses, the performance subtests were not administered, and that Plaintiff had a verbal IQ score of 57. Included in a handwritten comment on an April 16, 2009 fax cover sheet for this report are the words: "here is revised report for Dejuan hopefully will resee him on 4/25." (Tr. 657-666).

DDS records reflect that on March 31, 2009, a DDS counselor told Plaintiff's mother, on the telephone, that the testing with Dr. Brown was rescheduled for 9:30 on April 11, because testing had not been completed; Plaintiff was asked to wear his glasses. Afterwards, on that same day, March 31, Plaintiff's mother called and said she wanted the appointment on a different

day; the counselor said that was the best appointment; Plaintiff's mother reported during this phone call that Plaintiff did "NOT wear glasses or corrective lenses, never had any problems." Then, later on March 31, 2009, the DDS counselor left a message that Plaintiff was rescheduled to see Dr. Brown on April 11, 2009, at 10 a.m.; and it was very important that he fully cooperate with Dr. Brown during the interview. Then, on April 9, 2009, Plaintiff's mother called DDS and stated that Plaintiff would be unable to make his appointment; the counselor told her that it was very important that he keep the appointment because he had been "less than cooperative at his last CE"; Plaintiff's mother said she was working on getting him to the appointment and that she understood that Plaintiff could lose his disability benefits if he did not attend the CE. Plaintiff's mother called DDS on April 11, reporting that he left the house at 8:30 that morning cursing at the television, and she did not think he would go to his CE appointment that morning. On April 16, Plaintiff told DDS that he could not keep his appointment on April 11 because his "Auntie was supposed to bring him but her car was broken down. . . . He said he [did not] have money to take the bus and won't until he gets his disability money." The DDS counselor informed Plaintiff that he had a consultive appointment on April 25, and that he needed to attend or his disability would be terminated. Plaintiff was sent a letter on April 16 informing him of his April 25 appointment with Dr. Brown at 11:30; enclosed with the letter were bus passes for him for purposes of his attending.

On April 24, Plaintiff reported that he received the passes and said that he would attend. Plaintiff then called DDS on April 25, stating that he received only two bus passes and that he needed some for his mother so she could attend the exam with him; he could not "get down there by himself." Later that morning, at 10:30 a.m., the DDS counselor spoke with Plaintiff's mother and told her that Plaintiff's disability would be terminated for failure to cooperate if he did not

attend the CE that day; she said Plaintiff had no way to get to the examination; the DDS counselor told Plaintiff's mother that Plaintiff had been sent bus passes; Plaintiff's mother said she needed to go with him; the counselor said he was 18 and needed to attended regardless; and Plaintiff's mother said she understood and would try to get him there. It was noted by DDS that Plaintiff failed to see Dr. Brown on April 25, 2009. (Tr. 667-69).

On October 12, 2009, Plaintiff presented for an examination at Medex, regarding his disability claim. Carmen Curtis, Ph.D., who conducted the examination reported that Plaintiff was driven to the interview by his brother; he alleged reading, learning, and behavioral disorders; Plaintiff was not on any medications; and Plaintiff said he left school after he was "locked up," he felt he was "too old to be in 9th or 10th grade," and he was currently taking GED classes. Upon examination, Dr. Curtis reported that Plaintiff's grooming was within normal limits and he was not wearing glasses; Plaintiff was "generally coherent, relevant, and logical," and generated "some spontaneous conversation"; his cooperation was "[f]air"; Plaintiff had no problems with receptive or expressive language ability; Plaintiff's mood was "dysphoric"; his affect was "slightly blunted and generally appropriate"; Plaintiff reported no current auditory hallucinations; Plaintiff had "thoughts of wanting to harm people during arguments but [had] no plan, intent, or attempt"; he was oriented in all spheres; as for Plaintiff's memory, he was able to "repeat 4 digits forward"; as discussed, in detail, below, Plaintiff's scores on "TOMM," a test for malingering, raised concerns that he had not put forth his best effort on other tests administered; based on results of the TOMM test, Dr. Curtis did not administer an IQ test; Plaintiff had was not wearing "corrective lenses" and "made no mention of difficulty seeing or needing glasses"; he had a "mild to moderate impairment" in regard to social functioning"; and he had no problems caring for his personal needs. Dr. Curtis diagnosed Plaintiff with a GAF of 62 and with mild

mental retardation, and reported that he had moderate difficulty understanding and remembering instructions; that Plaintiff said he had difficulty sustaining concentration and persistence in tasks; and that he had mild to moderate impairment in social interactions and adapting to his environment. (Tr. 689-93).

Also, a nursing assessment, dated September 26, 2007, reflects that Plaintiff's vision, without glasses, was "20/20" in both eyes, and that he "pass[ed] a vision examination. (Tr. 340). June 20, 2010 Emergency Department records, from St. Alexius Hospital, reflect that, without lenses, Plaintiff's right eye vision was "20/20"; his left eye vision was "20/25"; and his vision in both eyes was "20/25." (Tr. 739).

Plaintiff testified at the hearing that he had been in special education classes all his life; he tried to obtain a GED, but stopped; he left school in the ninth grade because he "got kicked out" because he had too many uniform violations; in the seven years since he left school, he had not been working; he lived with his parents and sister; and no one would hire him because he could not complete a job application. (Tr. 41-48). When the ALJ asked Plaintiff what he had been doing for seven years, Plaintiff responded: "Shoot man. I've been getting Social Security you know because I couldn't work. . . . They was giving me Social Security. Just shut me off my benefits and left me dry." (Tr. 48). When asked by the ALJ whether he ever helped his father who was a handyman, Plaintiff responded that the prior summer he "did a little construction" with his father; this work involved demolition, such as tearing down walls. (Tr. 49). In response to the ALJ's asking Plaintiff what he did all day, Plaintiff stated that he just sat at home; he walked to the store to get a cigarette; he had played basketball at the YMCA with friends in 2009; at the time of the hearing, he had not played basketball in two years; and he shopped for groceries for his mother, who gave him a list that he would give to the man at the

store.  Plaintiff further testified that when he received benefits, he helped his mother with the bills; after they "shut [him] off," she was "hurting for high rent"; after he stopped receiving benefits he became depressed and was "flipping out" and angry with his sisters; and he could not ride the bus, do simple arithmetic, read big words, read street signs and did not have a driver's license or "know how to catch the bus."  (Tr. 50, 58-59, 60-61, 63-64).

When asked if he wore glasses, Plaintiff testified that he wore them just when he read, and that he could not "read to tell you the truth."  (Tr. 62-63).  He also testified that he was taking one medication, which calmed him down (Tr. 65); he had trouble with getting distracted; he had a short attention span; he had trouble "just talking"; he got into fights with people "[e]verywhere"; and he got into fights "because it be like you know [he] [felt] like somebody [was] picking on [him] . . .  [b]ecause" he did not "got what they got" (Tr. 71).  Plaintiff said that he had problems with anger management and had been in an anger management program as a juvenile after he "punched a security guard."  (Tr. 74).

The ALJ found that since April 15, 2009, Plaintiff had the severe impairments of major depressive disorder (MDD) and mild mental retardation (MMR); and he did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels, but that he had the following non-exertional limitations:  he could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for 2-hour segments over an 8-hour period; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; adapt to routine, simple work changes; and perform work at a normal pace without production quotas.  The ALJ further found that Plaintiff had no past relevant work, and, based on his age, education, work experience,

and RFC, there were jobs existing in significant numbers in the national economy which Plaintiff could perform, such as construction worker and laundry workers. As such, the ALJ found Plaintiff was not disabled.

Plaintiff argues the ALJ's decision is not based on substantial evidence because the ALJ rejected Plaintiff's March 2009 score of 57 on the WAIS test administered by Dr. Brown; the rejection of this score was not supported by the record as a whole; and the ALJ's determination that Plaintiff did not meet Listing 12.05 (the listing for mental retardation) was not supported by the record as a whole.[2] For the following reasons, the court finds Plaintiff's arguments without merit and that the ALJ's determination that Plaintiff was not disabled is based on substantial evidence.

## A.     Plaintiff's Credibility:

The ALJ held that he had given considerable weight to Plaintiff's "lack of credibility." (Tr. 28). The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including whether Plaintiff's IQ score of 57 was determinative. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Guilliams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin,

---

[2] In his reply brief, Plaintiff makes a rather disjointed argument suggesting that Defendant failed to explain or justify why Dr. Brown submitted two versions of her report and failed to explain which version was the final one. As suggested above, the record clearly reflects which report was the "revised report." In any case, the issue before this court is whether substantial evidence supports the ALJ's decision. As such, the court will consider the record as a whole.

830 F.2d at 882. To the extent that the ALJ did not specifically cite <u>Polaski</u>, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. <u>Randolph v. Barnhart</u>, 386 F.3d 835, 842 (8th Cir. 2004); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 n.3 (8th Cir. 2000); <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996); <u>Montgomery v. Chater</u>, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each <u>Polaski</u> factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. <u>See Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). <u>See also Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each <u>Polaski</u> factor as long as the analytical framework is recognized and considered."); <u>Strongson</u>, 361 F.3d at 1072; <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003). <u>See also Halverson v. Astrue</u>, 600 F.3d 922, 932 (8th Cir. 2010); <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that, although Plaintiff indicated he was receiving mental health treatment from a physician, the record indicted he had seen the physician only once. (Tr. 29). In fact, Plaintiff testified that he was "still seeing Dr. Zanges," and that he was seeing him for

regular check-ups and for depression. (Tr. 74-75). The record reflects that Plaintiff saw Darryl T. Zinck, M.D., at the Family Care Health Center, in May 2005, for "Adult Td." and on February 17, 2006, for shingles, with a secondary infection, and that he also went to the Family Care Health Center on another occasion, (Tr. 645-46). The record also reflects that Plaintiff also presented to Dr. Zink, on October 11, 2011, complaining of dysphoric episodes, becoming angry "very quickly," hearing voices, and occasional suicidal ideation with thoughts of "blowing [his] brains out." (Tr. 721). Plaintiff's visit with Dr. Zink, in October 2011, is the only treatment by a physician for a psychological/mental condition which Plaintiff references in his Brief, other than his presenting to the emergency room in June 2010, when he "got into it with his brother." (Doc. 17 at 5). Thus, contrary to Plaintiff's testimony, the record did not reflect Plaintiff was undergoing continuing mental health treatment from a physician.

Second, the ALJ considered that Plaintiff failed to follow up with a behavioral health provider to whom he had been referred. (Tr. 29). In this regard, the record reflects that Dr. Zink referred Plaintiff to a behavioral health provider after he saw Plaintiff on October 11, 2011, but that Plaintiff did not show up for his appointment on October 17, 2011. (Tr. 720). See Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's non-compliance with prescribed treatment); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant=s failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain).

Third, the ALJ considered that Plaintiff did not disclose "important elements of his educational background at the hearing, leaving the impression that he had no education beyond 9th grade, when, in fact, he had reenrolled in high school." (Tr. 28). Indeed, records from

Roosevelt High School reflect that Plaintiff enrolled in the tenth grade in February 2008, and that he attended for twenty-four days through April 14, 2008. (Tr. 628).

Fourth, the ALJ considered that Kyle DeVore, Ph.D., a psychologist, found that Plaintiff was dishonest in his session with Dr. Brown, who reported Plaintiff's verbal IQ was 57. Dr. DeVore, who was a State agency consultant, considered that Plaintiff told Dr. Brown he was unable to perform picture completion when taking the IQ test administered by Dr. Brown because of difficulty seeing since he left his glasses home, but later Plaintiff and his mother both denied that he wore glasses. Dr. DeVore also considered that Plaintiff claimed he did not know his Social Security number or date of birth during Dr. Brown's examination, but that he was able to provide this information to the DDS counselor without any difficulty. Dr. DeVore further considered that, because Dr. Brown's examination was not completed due to Plaintiff's not having his glasses, the evaluation was rescheduled; both Plaintiff and his mother were informed regarding the importance of attending this examination and giving full co-operation. (Tr. 685-86). Plaintiff, however, did not attend, due to lack of transportation; as a result, Plaintiff was sent bus passes for him to attend another appointment, but he did not attend because he said he could not do so without his mother, who was not sent a bus pass. Based on these factors, Dr. DeVore noted that Plaintiff had been given every opportunity to attend a second examination with Dr. Brown, and concluded that a determination could not be given without Plaintiff's attending a new examination to obtain a current IQ score; that the claim should be terminated due to Plaintiff's failure to co-operate; and that Plaintiff had been unreliable and not credible in his reporting and allegations. (Tr. 685-86).

As a State agency consultant, Dr. DeVore's opinion was entitled to be considered by the ALJ. See 20 C.F.R. '' 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are

highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence.). Further, Dr. DeVore is a psychologist and thus, an expert who was qualified to give an opinion in regard to Plaintiff=s mental status. See Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006) (A[M]edical opinions= are defined as >statements from physicians and psychologists or other acceptable medical sources.=@) (quoting 20 C.F.R. ' 404.1521(a)). Finally, just as with the opinions of other medical sources, the ALJ must explain the weight given to the opinion of a State agency consultant, which the ALJ in the matter under consideration did. See 20 C.F.R. '' 404.1527(f)(2)(ii), 416.927(f)(2)(ii); Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1076 (7th Cir. 1992) (internal citations omitted) (noting in determining weight to be given to State agency consultant=s opinion, ALJ Amust minimally articulate his reasons for crediting or rejecting evidence of disability@).

Fifth, the ALJ considered that Dr. Curtis, who examined Plaintiff on October 12, 2009, reported that she found evidence of malingering on the basis of an objective test. (Tr. 28). See Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002) (while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, ALJ is entitled to make a factual determination that claimant=s subjective pain complaints are not credible in light of objective medical evidence) (citing 20 C.F.R. ' ' 416.908, 416.929). As stated above, Dr. Curtis administered the "TOMM," a test designed to assess malingering. She reported that, on trial 1, Plaintiff scored a 24, which was within the 95% confidence interval for a performance based on chance alone. On trial 2, his score of 29 was "well below the cutoff of 45, which raise[d] concerns and suggest[ed] that [Plaintiff] did not put forth maximum effort." She further reported that Plaintiff's score improved slightly to 30 on the Retention Trial, and that he

seemed disappointed in himself when he did not arrive at the correct answer. Dr. Curtis opined that, "[b]ased on these results, malingering should be considered as a possibility. These scores raise[d] concerns that [Plaintiff] would not put forth his best effort on other administered tests, which could negatively impact the validity of his other scores." (Tr. 691). Based on this conclusion calling into question Plaintiff's effort and the validity of further testing, Dr. Curtis did not administer the WAIS-IV. Dr. Curtis noted that, in April 1998, WISC-III, Plaintiff had a verbal IQ of 62, a performance IQ of 65, and a full scale IQ of 60; he had a full scale IQ of 65 on the WISC-III, in January 2002; and he had a verbal IQ of 57 on the WAIS-III, in March 2009. Dr. Curtis stated that all of these scores placed Plaintiff in the range of "mild retardation."

Dr. Curtis also noted that although Plaintiff complained of not having his glasses when administered testing in March 2009, he did not wear glasses during Dr. Curtis's interview; he "made no mention of difficulty seeing or needing glasses"; and, in follow up with Plaintiff's mother after the March 2009 examination, she reported that Plaintiff did not wear glasses. <u>Cf.</u> <u>Karlix v. Barnhart</u>, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between a claimant=s sworn testimony and what he actually told physicians weighs against the claimant=s credibility). Dr. Curtis opined that a diagnosis of mild mental retardation was warranted, but that Plaintiff's TOMM suggested that current WAIS-IV scores would be invalid. (Tr. 691-92). As stated above, in regard to Dr. DeVore, as a psychologist, Dr. Curtis was qualified to give an opinion in regard to Plaintiff=s mental status. <u>See</u> <u>Lacroix</u>, 465 F.3d at 886.

Although Plaintiff argues that the Commissioner no longer authorizes tests like the TOMM, in Plaintiff's case (Pl. Br. at 19), it was in the record and thus was properly considered by the ALJ. <u>See</u> 20 C.F.R. ' 416.912(b) ("Evidence is anything you or anyone else submits to us or that we obtain that relates to your claim."). Moreover, the TOMM was not the only evidence

the ALJ considered when concluding that Plaintiff was not entirely cooperative, see Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."), and any deficiency in regard to the ALJ's consideration of the results of the TOMM does not require setting aside the ALJ's decision where the deficiency has no bearing on the outcome, see Hepp, 511 F.3d at 806 ("Consequently, the deficiency does not require reversal since it had no bearing on the outcome.").

Sixth, the court notes that Plaintiff testified that he had been arrested once, for trespassing, but the matter was dismissed, and he had never been to court for any other reason. (Tr. 62). Dr. Curtis's report states, however, that, in addition to the trespassing arrest, Plaintiff spent "1-2 months in jail for burglary twice." (Tr. 690). Further, although Plaintiff testified at the hearing that he did not have an aunt who took him places (Tr. 61), he told the DDS counselor that he did not attend his rescheduled consultive examination with Dr. Brown because his aunt was supposed to take him and her car broke down. Although Plaintiff said he did nothing during the day other than walk to get a cigarette, when questioned by the ALJ about his having been treated for an STD in 2010, Plaintiff said he contracted the STD when he "picked up" a woman in a club on "the east side," called the "Pink Slip." When asked how often he went to strip clubs, Plaintiff testified that he did not go to them anymore, "we just went there one time, man. When that happened, I quit, man. You know I always get checkups . . . because I know if I'm doing something I've got to you know." (Tr. 69-70). Cf. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between claimant=s sworn testimony and what he actually told physicians weighs against claimant=s credibility).

In conclusion, the court finds that the ALJ's credibility determination is based on substantial evidence, including his determination to give little weight to Plaintiff's verbal IQ score of 57.

**B.     Listing 12.05 (Mental Retardation):**

Plaintiff argues the ALJ erred in failing to find he met Listing 12.05.  20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 ' 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Section 12.00(a) further lists mental disorders in diagnostic categories, which includes, among others, mental retardation (' 12.05).

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. ' 404.1520a.  A special procedure must be followed at each level of administrative review.  See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

The sequential process for evaluating mental impairments is set out in 20 C.F.R. ' 404.1520a.  This Regulation states that the steps set forth in ' 404.1520 also apply to the evaluation of a mental impairment.  See 20 C.F.R. ' 404.1520a(a).  However, other considerations are included.  The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists.  20 C.F.R. ' 404.1520a(b)(1).  These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. ' ' 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent.  See 20 C.F.R.' 404.1520a(b)(1).  The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. ' 404.1520a(c)(2).   Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.  See 20 C.F.R. ' 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either Anone, mild, moderate, marked, [or] extreme.@ 20 C.F.R. ' 404.1520a(c)(4).  The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: A[n]one, one or two, three, four or more.@  Id.  When Athe degree of []limitation in the first three functional areas@ is Anone@ or Amild@ and Anone@ in the area of decompensation, impairments are not severe, Aunless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant=s] ability to do basic work activities.@  20 C.F.R. ' 404.1520a(d)(1).  When it is determined that a claimant=s mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder.  This is done by comparing the medical findings about a claimant=s impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.  See 20 C.F.R. ' 404.1520a(d)(2).  If it is determined that a claimant has Aa severe mental impairment(s) that neither meets nor is equivalent in severity to any listing,@ the ALJ must then assess the claimant=s RFC.  20 C.F.R. ' 404.1520a(d)(3).

Additionally, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 ' 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Listing 12.05 provides that a person may be found disabled due to an intellectual disability based on a "significantly subaverage general intellectual functioning, with deficits in adaptive functioning initially manifested during the developmental period, before age 22."  The required level of severity for Listing 12.05 is "met when the requirements in A, B, C, or D are satisfied."   As relevant, a claimant meets the requirements of 12.05B if he has a verbal performance or full scale IQ score of 59 or less; he need not have other limitations.  He meets the requirements of 12.05C if he has a valid verbal or full scale IQ of 60-70, resulting in at least two of the following:  "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Finally, a claimant meets the requirements of 12.05D if he has a full scale IQ of 60-70, resulting in at least two of the following:  "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  Failure to meet any of the criteria precludes application of the Listing, and the ALJ must continue to step four of the sequential evaluation process.

As required by the Regulations, the ALJ considered the evidence relevant to Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace, and

whether he had episodes of decompensation. In regard to activities of daily living, the ALJ found Plaintiff had a mild restriction after considering that Plaintiff lived with his parents and siblings; his mother took care of household responsibilities; sometimes Plaintiff helped with household chores and went grocery shopping; and he did not have a driver's license and allegedly did not know how to ride the bus. In regard to social functioning, the ALJ found Plaintiff had moderate difficulties, after considering, among other things, that he claimed to be socially isolated and have fights with others; and he had a history of social aggression, although he had previously played basketball with others. In regard to concentration, persistence, or pace, the ALJ found Plaintiff had moderate difficulties, after considering that he had difficulty concentrating and required prompting to complete items on psychological tests which were administered. The ALJ also considered Plaintiff's school records to reach his conclusion that Plaintiff had moderate difficulties in this area. The ALJ finally considered that there was no evidence Plaintiff had any episodes of decompensation, which existed for an extended duration. The court finds that the ALJ's decision, in regard to the domains specified by the Regulations, is based on substantial evidence.

Consistent with the Regulations, the ALJ considered Plaintiff's IQ scores, including Dr. Brown's report, and concluded that there were no valid IQ scores from the relevant period establishing Plaintiff had an IQ score of 70 or below. Indeed, as considered by the ALJ, Plaintiff had been given sufficient opportunity to complete such testing, but he failed to do so. As discussed above in regard to Plaintiff's credibility, the ALJ considered that Dr. Brown, a consultive examiner, reported that Plaintiff had a verbal IQ score of 57, and that as a result of Plaintiff's not having his glasses, she limited her testing to the verbal component of the test. The ALJ further considered that Dr. Brown qualified her diagnosis by stating that full administration

of testing could not be completed based on Plaintiff's failure to have his corrective lenses. The ALJ concluded that Plaintiff's failure to cooperate and take the remainder of the IQ test administered by Dr. Brown was persuasive evidence that he was not putting forth his best effort when he took the verbal component. As such, the ALJ found that "the score of 57 on the verbal component, which was the only part of the test he took, [was] of questionable validity." (Tr. 25). The ALJ further considered that the IQ score of 57 was "considerably lower than his 2002 verbal score of 73." Although Dr. Brown reported that she did not think that Plaintiff was intentionally performing less than his capabilities, the ALJ noted that Dr. Brown had no way of knowing at the time that Plaintiff was "avoiding taking the entire test by pretending that he had forgotten his glasses." (Tr. 25).

On reaching the conclusion that Plaintiff pretended to have forgotten his glasses, the ALJ considered that DDS followed up with Plaintiff to ask for a complete test at a later date; he and his parent were contacted; when they said they had no transportation, Plaintiff was sent bus passes; when he failed to attend, he said it was because he could not come without his mother and she had not been sent a bus pass; but that Plaintiff attended two other consultive examinations without her. (Tr. 25).

Indeed, gauging the validity of IQ testing is within the province of the ALJ. See Phillips v. Colvin, 721 F.3d 623 (8th Cir. 2013) (task of resolving conflicts in evidence regarding validity of IQ test was the domain of the ALJ). Specifically, the Eighth Circuit has affirmed an ALJ's finding that a claimant did not meet Listing 12.05 despite the presence of IQ scores in the necessary range where there were inconsistences between the claimant's daily activities and functioning and his low IQ scores. See id. at 629.[3] Additionally, the Eighth Circuit has held that

---

[3] Plaintiff attempts to distinguish Phillips, 721 F.3d 623, on the basis that the court in Phillips relied on the claimant's daily activities when discrediting his lower IQ scores in favor of later

an ALJ may discount results of psychological testing where there is evidence that the claimant malingered during testing.  See Johnson v. Barnhart, 390 F.3d 1067m, 1070-71 (8th Cir. 2004).[4] The court finds that the ALJ properly considered the validity of Plaintiff's verbal IQ score of 57 and that the ALJ's decision, in regard to the weight given Plaintiff's verbal IQ score of 57, is based on substantial evidence.

Moreover, Dr. Brown only found Plaintiff had mild mental retardation; the mere existence of a mental condition is not per se disabling.  See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981).   Additionally, in the first version of her report, Dr. Brown reported that Plaintiff's prognosis was fair, and he would "likely improve[] with appropriate treatment intervention including psychiatric care and further testing with possible placement in vocational rehabilitation."  (Tr. 657).   In the second version of her report, Dr. Brown also said that Plaintiff's prognosis was fair, and stated that he "would likely improve with appropriate treatment intervention (psychiatric care) and compliance." (Tr. 666).  Conditions which can be controlled by treatment are not disabling.  See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (if an impairment can be controlled by treatment, it cannot be considered disabling).   Thus, Dr. Brown did not suggest that, based on his mild mental retardation, Plaintiff was unable to engage in substantial gainful activity.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that

higher scores.  (Doc. 26 at 1).  As discussed above, the ALJ did consider Plaintiff's daily activities in terms of his level of functioning.  Moreover, the issue at hand is whether substantial evidence in record as a whole supports the ALJ's decision.

[4] Plaintiff attempts to distinguish Johnson, 390 F.3d 1067, on the basis that the consultive examiner in Johnson opined that the claimant was malingering, but that Dr. Curtis suggested only that it was a possibility that Plaintiff was malingering.  Plaintiff misses the point of the holding in Johnson, as set forth above; where the evidence indicates that the claimant was malingering, the ALJ can draw such a conclusion.

no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.®).

Finally, Dr. Brown's revised report suggests that she was unable to fully evaluate Plaintiff as she suggested further psychiatric evaluation. (Tr. 657). Indeed, further evaluation, particularly that of Dr. DeVore and Dr. Curtis, suggested that Plaintiff had not been forthright during Dr. Brown's evaluation. In conclusion, the court finds the ALJ gave proper weight to Dr. Brown's report, and her decision, in this regard, is based on substantial evidence.

Further, as discussed above in regard to Plaintiff's credibility the ALJ considered Plaintiff's medical records and the reports of Dr. Brown, Dr. DeVore, and Dr. Curtis, and concluded that Plaintiff was not fully credible. The court has found the ALJ's credibility determination is based on substantial evidence. To the extent Plaintiff argues the ALJ did not consider all of Dr. Curtis's report (Pl. Br. at 19), the ALJ's failure to discuss every aspect of Dr. Curtis's report does not mean in failed to consider the report in its entirety. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) ("Given the ALJ's specific references to findings set forth in Dr. Michaelson's notes, we find it highly unlikely that the ALJ did not consider and reject Dr. Michaelson's statement that Wildman was markedly limited"). In conclusion, the court finds that the ALJ's determination that Plaintiff did not meet listing 12.05 is based on substantial evidence, and consistent with the Regulations and case law.

In any case, the ALJ did account for Plaintiff's mild mental retardation in his RFC determination, as set forth above. Based on the above discussion regarding Plaintiff's credibility, and the consideration of Plaintiff's IQ and all evidence of record, the court finds the ALJ's RFC determination is based on substantial evidence. After determining Plaintiff's RFC, the ALJ then posed a hypothetical to a VE which described a person of Plaintiff's age and with his education,

work experience, and RFC, including his non-exertional limitations. See Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992) (ALJ must obtain testimony of VE where he finds claimant has non-exertional limitations which diminish her capacity to perform the full range of activities listed in the Guidelines). The VE testified that there was work in the national economy which Plaintiff could perform. As such, the ALJ found Plaintiff not disabled. The court finds that this ultimate determination of the ALJ is based on substantial evidence. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (ABased on our previous conclusion ... that >the ALJ's findings of [the claimant=s] RFC are supported by substantial evidence,= we hold that >[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner=s denial of benefits.@) (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE=s testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant=s limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint be **DENIED**; Docs. 1, 17.

**IT IS FURTHER RECOMMENDED** that a separate judgment be entered incorporating this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE


Dated this 2nd day of June 2014.